**Richard RINGER, Plaintiff,**

v.

**UNION PACIFIC RAILROAD, Defendant.**

**No. 93 C 4130.**

United States District Court, N.D. Illinois, Eastern Division.

Nov. 16, 1994.

Steven Michael Levin, David B. Wilson, Levin & Perconti, Chicago, IL, for plaintiff Richard Ringer.

Bernard Roccanova, Ross & Hardies, P.C., Chicago, IL, for defendant Union Pacific R.R.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

When the Union Pacific Railroad acquired the Missouri–Kansas–Texas Railroad, a/k/a KATY, in 1988, Richard Ringer chose employment with Union Pacific over a buy-out deal offered to all KATY employees. Ringer had been a sales representative for KATY in Milwaukee. His employment with Union Pacific called for him to perform similar duties in the same location under the title of "account manager." Robert Merrifield, Regional Sales Manager in Chicago, supervised Ringer and all other account managers in the region and reported to William Rody, Assistant Vice President of Sales, who managed all Union Pacific sales personnel—80 sales reps in nine regions.

Union Pacific presented Ringer with a Job Agreement and Performance Appraisal form that outlined job requirements and objectives and identified categories of criteria for semi-annual evaluations of account managers. Performance ratings range from 1 to 5—best to worst. Each account manager receives a rating in each category and an overall performance rating. An account manager who receives an overall rating of 4 ("does not meet some performance requirements") or 5 ("does not meet performance requirements") is automatically enrolled in a Development Action Plan, designed to remedy performance shortcomings. Merrifield evaluated the account managers in his region, and

Rody reviewed the evaluations from all nine regions.

Further evaluation comes in the form of observation during actual customer calls. Merrifield accompanied each of his account managers on a number of such calls and evaluated their performance according to the criteria set forth in the Quality of Call form. Here too, the rating scale is 1 to 5, but the direction is reversed; one is worst, five is perfect.

Ringer received ratings of 3 ("consistently meets performance requirements") in almost all categories and for overall performance on Merrifield's first two formal evaluations, May 1989 and October 1989. Nevertheless, on both occasions Merrifield ranked Ringer at the bottom of account managers in his region, and, late in 1989, recommended Ringer's relocation to Chicago so that Merrifield could supply more direct supervision[1] and Ringer could work on steel accounts with which he had become familiar at KATY. Moreover, in December 1989, Merrifield gave Ringer a quality-of-call rating of 2.95, against a regional average of 3.49. Ringer's reassignment to Chicago took effect on 1 January 1990.

Three months later, and two months before Ringer's next formal evaluation, Merrifield sent him a memorandum outlining several performance problems, including failure to submit timely expense reports, failure to check-in when out of the office, a substantially insufficient frequency of face-to-face client calls, and failure to produce timely Major Account Action Plans. Whether Ringer's performance had declined or Merrifield's patience had grown thin since the last evalua-

tion,[2] the memorandum clearly communicates Merrifield's dissatisfaction: "the overall execution of your position accountabilities does not meet performance requirements. I cannot and will not accept a continuance at present levels."

Two months later, the May 1990 evaluation reflected Merrifield's continuing displeasure. Ringer's overall performance rating fell to 4 ("does not meet some performance requirements"), requiring his enrollment in a Development Action Plan. Ringer received ratings of 4 in half of the eight performance categories, with comments citing numerous shortcomings. His quality-of-call rating had risen only slightly, to 3.07, and he was $7.4 million short of his 1990 revenue goal.[3]

Although some problems persisted, Ringer generally bounced back in his next formal evaluation, October 1990. His overall rating returned to 3 and he received a lesser rating in only one of the eight performance categories.[4] Nevertheless, Merrifield still ranked Ringer near the bottom of account managers in the region—eleventh out of twelve, the twelfth being a new employee.

Three months after this evaluation, in January 1991, William Rody accompanied Ringer on a call to one of Union Pacific's largest accounts, U.S. Gypsum. Rody frequently reviewed performance in the field; from 1988 to 1991, he attended approximately 3000 client calls with Union Pacific sales personnel.

According to Ringer, during their ride to U.S. Gypsum, Rody asked his age, Ringer replied that he was 54, and Rody responded

1. Merrifield believed that Ringer was spending too much time socializing with buddies on the customer side, a plausible sales tactic in a regulated environment where rail carriers offered identical services at identical rates, but less productive than negotiation and close study of the customers' business in a deregulated environment. Congress deregulated the railroad industry in the Staggers Act of 1980; thus, most of Ringer's career in sales of railroad services had been in a regulated environment.

2. Although Ringer's numerical ratings in the first two evaluations indicate satisfaction of performance requirements, the comments on these evaluations mix praise with criticism.

3. Ringer attributes his revenue shortfall throughout 1990 to poor goal-setting by his predecessor, a poor economy (especially in the steel and lumber industries), and accounts on which he shared responsibility with a national account manager. Indeed, Merrifield acknowledged these problems, but nevertheless gave Ringer low ratings and rankings. Ringer offers no comparison of his problems to those faced by other Union Pacific account managers. Without such comparison, he cannot begin to challenge Merrifield's assessments.

4. The rating of 4 reflected a $14 million shortfall against Ringer's 1990 revenue goal.

by saying "You scare me saying that." Rody does not recall the conversation.

■ He does remember that Ringer's call at U.S. Gypsum was the worst he had ever attended. Specifically, he says that Ringer had inadequately prepared, failed to speak clearly, and addressed the customer in an adversarial and interrogating manner.[5] Ringer says that he reported Rody's comments to Merrifield, who told him "That is no big issue." Of course, Merrifield's comment on Ringer's report says little about Rody's assessment of what he saw and heard at U.S. Gypsum, especially since Ringer says he related to Merrifield three concerns Rody had raised, but does not include among these Rody's criticisms for failing to speak clearly and addressing the customers in an adversarial manner, issues which Ringer admits Rody raised with him after the call.

At Rody's suggestion, Merrifield subsequently decided to place Ringer on a second Development Action Plan. No other account manager in the region was on such a plan at the time. Merrifield informed Ringer that Union Pacific would remove him from his position unless his performance improved.

In April, Merrifield told Ringer his response to the Development Action Plan had been "perfect" up to that time, but Merrifield's next formal evaluation, two months later, reflected extreme dissatisfaction. In the May 1991 review, Ringer's overall rating returned to 4. His quality-of-call rating had dropped to 2.5. He had made no calls on prospective new customers between January and June of 1991. As on every prior formal evaluation, Merrifield cited Ringer for insufficient participation in the Major Account Action Plan program and communication problems. On this evaluation, reported on an apparently new form that provided for ratings in nine performance categories, Ringer received six ratings of 4 ("does meet some performance requirements") and one of 5 ("does not meet performance requirements"). The rating of 5 reflected a shortfall against Ringer's 1991 revenue goal of $2.8 million as of April.[6] Merrifield commented that Ringer was still on the Development Action Plan, "but based on present performance, I would recommend removal from current position."

Merrifield told Ringer that he could no longer remain an account manager and suggested that Ringer seek a position elsewhere in the company. Ringer interviewed for, but did not obtain, a position in Union Pacific's customer service department in St. Louis.[7] He also interviewed for a prospective position in what was to be a new department—transloading—but Union Pacific decided not to create that department. The railroad ter-

---

5. Ringer attempts to refute Rody's assessment of the call by citing praise from one customer at the meeting, Daniel Carey, the "transportation chief" at U.S. Gypsum. Generally, a customer's favorable opinion does not raise a genuine issue concerning failure to meet the employer's legitimate expectations. *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir.1983). Here, however, Ringer may be disputing Rody's veracity, rather than his judgment. The argument might be that Rody did not, in fact, find Ringer's performance at the call wanting, but simply said so because he wanted to get rid of an older employee. But to establish this position, Ringer needed to challenge the asserted factual basis of Rody's opinion, and he has not. For example, Ringer has neither denied nor offered any evidence contradicting Rody's statement that "he began asking questions as if he were interrogating them in a non-friendly atmosphere, it was kind of like a cross-examination." Rody may have found this imprudent even if Carey took no notice. Moreover, as will be seen, even if discriminatory animus colored Rody's comments, Ringer cannot establish this as a but-for cause of his discharge, given Merrifield's prior and subsequent evaluations.

6. Ringer attributes the shortfall to "the soft economy and competition from other carriers." But he does not distinguish his situation from that of any other Union Pacific account manager. He attributes part of the shortfall to loss of a steel account due to "a pricing problem with the Union Pacific marketing department." But he does not describe the problem, nor explain how much of the $2.8 million shortfall it might account for. Moreover, he has not included in the record the deposition pages that he cites in support. And even if they had been included, Ringer has not made the necessary comparison to other account managers that would provide a basis for challenging the 5 rating resulting from the shortfall.

7. Union Pacific says Ringer did not get this position because he lacked requisite skills. Ringer denies this, saying that Union Pacific never tested him for the job "because the testing employee's computer was broken." The dispute is not material; Ringer does not even attempt to connect his failure to obtain the St. Louis job to Rody's, or anyone else's, consideration of age.

minated Ringer on 10 July 1991 and assigned his accounts to a younger employee named Paula Bangura.

▉ Ringer need not prove that Union Pacific's decision to terminate him rested on age alone, but he must prove that age was a determining factor, a but-for cause. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993). He may meet the burden with direct or circumstantial evidence that age was a dispositive factor in his discharge, or he can invoke the familiar burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Sarsha*, 3 F.3d at 1038. Ringer has cast his argument exclusively in terms of *McDonnell Douglas*.

▉ Where the plaintiff pursues this course and the employer claims to have terminated him for inadequate performance, factual issues otherwise addressed under the qualified-employee prong of the prima facie case are properly deferred to the justification-pretext inquiry. *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1124 n. 4 (7th Cir.1994). A plaintiff may establish the pretextual nature of a proffered explanation for adverse action by establishing that (1) the reasons have no basis in fact, (2) the reasons offered did not actually motivate the adverse actions, or (3) although the reasons offered are grounded in fact and partially motivated the adverse actions, they were not sufficient to do so standing alone. *La Montagne v. American Convenience Products, Inc.*, 750 F.2d 1405, 1415 & n. 6 (7th Cir.1984) (noting that these three options do not necessarily exhaust the options for establishing pretext); *Smith v. General Scanning, Inc.*, 876 F.2d 1315, 1319 (7th Cir.1989). See also *Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1133 (7th Cir.1994) (implying that these are the exclusive means by which a plaintiff may establish pretext).

▉ For brevity's sake, I will skip over the prima facie case and go straight to the

third step of *McDonnell Douglas* because Ringer has no evidence establishing that the proffered reason for discharge—inadequate job performance—is pretextual. I have already addressed many of Ringer's arguments while setting out the facts of this case, but not the apparent smoking gun. Ringer's sworn statements show that while en route to a meeting that Rody was attending for the primary purpose of evaluating Ringer's performance, he not only asked Ringer's age, but also expressed displeasure with the answer.

However, nothing in the record suggests that Rody decided to take adverse action against Ringer prior to reading Merrifield's final evaluation recommending Ringer's removal from his current position, and Ringer has not even suggested that Merrifield harbored discriminatory animus or that Rody influenced or interfered with Merrifield's judgments.[8] Moreover, Ringer denies none of the facts cited in Merrifield's final evaluation, and expressly admits that despite a $2.8 million shortfall against his 1991 revenue goal, he made no calls on prospective new customers over the four or five months preceding the evaluation. Finally, Ringer points to no Union Pacific account manager with a similar performance record who received more favorable treatment. In sum, Ringer has no evidence suggesting that Union Pacific lacked a factual basis for judging Ringer's performance inadequate, or that this played no motivating role in the decision to discharge, or that, standing alone, his poor job performance did not provide a sufficient reason for termination. In such circumstances, the employer need not defend itself at trial.

### Conclusion

The defendant's motion for summary judgment is granted.

---

**8.** Remember also that, roughly eleven months before Rody accompanied Ringer to U.S. Gypsum, Merrifield had expressed his unwillingness to "accept a continuance at present [performance] levels," that the next formal evaluation reflected continued dissatisfaction nine months before the Gypsum call, and that, although Ringer's ratings improved in the interim, Merrifield still considered Ringer his weakest of twelve account managers, save one new employee. Thus, the mere sequence of events leading up to the June 1991 evaluation does not reveal such a marked change in Merrifield's attitude toward Ringer that any influence by Rody could be reasonably inferred.